Filed 9/7/23  In re Z.F.-G. CA4/2
See Concurring Opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re Z.F.-G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>R.F.,<br><br>    Defendant and Appellant. | E080883<br><br>(Super.Ct.No. J291393)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin,

Judge.  Reversed in part and affirmed in part.

Jill Smith, under appointment by the Court of Appeal, for Defendant and

Appellant.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for

Plaintiff and Respondent.

1

This dependency was precipitated mainly by the mother's relationship with a drug-abusing sex offender and his domestic violence against her and her son Z.F.-G (Z. or child), but also by the mother's own drug use and her corporal punishment of Z. Even before the dependency was filed, the mother ended the relationship. During the dependency, she successfully completed every aspect of her reunification services plan — except substance abuse treatment. She dropped out of outpatient treatment for a while and repeatedly tested "dirty" both in and out of treatment.

At the 12-month review hearing, the juvenile court found that the mother had not made significant progress in resolving the problems that led to the child's removal. It therefore terminated reunification services. Rather than set a hearing pursuant to Welfare and Institutions Code section 366.26,[1] it kept the child in foster care, because it found that he was not a proper subject for adoption and had no one willing to accept legal guardianship.

The mother contends:

(1) There was insufficient evidence that the mother had not made significant progress in resolving the problems that led to the child's removal to support the termination of reunification services.

---

[1] All further statutory citations are to the Welfare and Institutions Code.

(2)  There was insufficient evidence that the mother was provided with reasonable reunification services, because, among other things, she requested inpatient drug treatment services but was not provided with them.

(3)  The juvenile court and Children and Family Services (CFS) failed to carry out their duty to inquire of extended family members pursuant to state law implementing the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).

We agree that there was a failure to inquire of extended family members.  That means we must reverse the finding that ICWA did not apply; however, it does not require us to reverse anything else.  We will hold that the mother's failure to complete the substance abuse aspect of her reunification services plan was sufficient evidence that she had not made significant progress.  We will further hold that the reunification services were reasonable, even though the mother was not provided with inpatient drug treatment services.

II

STATEMENT OF THE CASE

When this dependency was filed, Z. was 11 and living with the mother.  The mother named two possible fathers, but one was dead and the other was eventually ruled out by a paternity test.  The mother had two adult children:  Mo.S., a daughter living nearby, and Mi.S., a son living in North Carolina.

In October 2021, CFS received reports that the mother was living with C.S., a registered sex offender, and that both of them were using drugs, including

3

methamphetamine. Moreover, C.S. had "laid hands" on the child. Thereafter, C.S. was arrested for being under the influence of methamphetamine, in violation of his probation.

When social workers interviewed the mother, she appeared to be under the influence of methamphetamine, "with pressured speech, irritability, and twitching movements." She claimed she had stopped using methamphetamine in 2017. However, she did not allow the social workers to conduct a walk-through of the home. She admitted currently using marijuana.

The mother said she and C.S. had broken up due to C.S.'s drug use. She admitted knowing that he was a registered sex offender. She said there had been incidents in which he had physically abused her. In 2020, she had filed for a restraining order against him, but she had "rescinded" it once he was sober and in counseling.

According to the mother, Z. once said that C.S. had hit him in the face, but he then recanted. She said that whenever Z. did not get his way, he would have "anger outbursts," in which he would break things, punch walls, or "tak[e] the hinges off the door." He "need[ed] constantly to move around." He made suicidal remarks, such as that "he 'doesn't want to be here anymore.'"

Z. told social workers he felt unsafe because C.S. had broken windows and threatened the mother. He knew C.S. used drugs. He was worried that the mother would let C.S back in the home.

Z. reported that, a year earlier, C.S. had punched him in the face; the mother yelled at C.S., but he responded by "assault[ing]" her, too. Another time, C.S. threatened him

4

with a sledgehammer; again, when the mother intervened, C.S. "assaulted her." Once, C.S. threatened to burn the house down. The mother called the police, and C.S. was arrested.

Z. said the mother disciplined him with "whoopings on the butt with a belt," which had once caused a bruise.

Mo.S. confirmed C.S.'s drug use and domestic violence. She was concerned about Z. because he would "zone out" and "go[] blank" when under stress. He had run away twice. She thought he might have ADHD. "She reported that discipline of Z[.] includes spanking him, yelling at him, and slapping him." She herself had recently tried to slap him.

Initially, the mother agreed to drug-test voluntarily, but later she refused to, claiming it would require missing work and she would be fired.

Accordingly, CFS detained Z. and filed a dependency petition concerning him. He was placed first with relatives, and then in two successive foster homes.

Thereafter, the mother admitted that she had been using methamphetamine up to "the day that they took Z[.]"

In April 2022, at the jurisdictional/dispositional hearing, the juvenile court dismissed the allegations as to the absent father. Otherwise, it found that the allegations of the petition were true, and it sustained jurisdiction based on serious physical harm (§ 300, subd. (a)) and failure to protect (§ 300, subd. (b)). It ordered reunification services for the mother.

In or before October 2022, Mi.S. requested placement.

In October 2022, at the six-month review hearing, the juvenile court continued reunification services and set a 12-month review hearing. It granted authority to pursue an interstate placement with Mi.S. However, the process was delayed because the social worker mistakenly thought Mi.S. lived in *South* Carolina.

In February 2023, at the 12-month review hearing, the juvenile court found that the mother had been provided with reasonable services but had failed to make substantial progress in resolving the problems that led to the child's removal. It therefore terminated reunification services. It also found that a section 366.26 hearing was not in the best interests of the child because Z. was not a proper subject for adoption and had no one willing to accept legal guardianship. (See § 366.21, subd. (g)(5).) It continued Z. in foster care and set a post-permanency review hearing.

III

THE TERMINATION OF REUNIFICATION SERVICES

The mother contends that the juvenile court's termination of reunification services was not supported by substantial evidence.

A. *Additional Factual Background*.

The evidence before the juvenile court at the 12-month review hearing consisted of two social worker's reports and one "Additional Information" (a/k/a 6.7) report. They showed the following.

The mother's reunification services plan required domestic violence classes, anger management classes, parenting education classes, individual therapy, a 12-step program, outpatient substance abuse treatment, and random drug testing.

In February 2022, she started outpatient treatment, but later she was terminated for nonattendance. She claimed the program conflicted with her work schedule. When she reported this to the social worker, in August 2022, she was given a new referral to the same provider for outpatient treatment. She requested inpatient treatment instead. After she discussed this with a substance abuse counselor, they agreed that she would try outpatient treatment first, but she could still request inpatient services "if she felt the need."

Meanwhile, between early February and early July 2022, the results of the mother's drug tests were positive, positive, negative, positive, positive, and five no-shows.

By June 2022, she had completed domestic violence, anger management, and parenting education. She participated in a 12-step program. She completed individual therapy and "signed up for addition[al] individual therapy of her own accord."

In September 2022, she claimed she had gone to drug-test, but "her name was not in the system." She submitted photos of the test site to prove she was there. The social worker "investigated and resolved the issue . . . ."

As of October 2022, the mother had a full-time job and a two-bedroom apartment.

Between mid-October 2022 and mid-January 2023, the mother's drug test results were positive, positive, positive, no show, negative, no show, and no show.

She was scheduled for outpatient intake in December 2022, but it was delayed due to a fire at the facility. On January 9, 2023, she completed intake; on that date, she tested positive. On January 17, 2023, she started outpatient treatment. She claimed she tried to drug-test on January 31 and February 14 but was not "on the list." She submitted photos of appointment cards for these dates, one with the handwritten notation, "Not on the list for today."

The mother had supervised visitation once a week, for two hours at a time. When the social worker was supervising the visits, she was appropriate and attentive. However, in September 2022, when the caregiver was supervising a visit, the mother instigated an argument with the caregiver. The caregiver refused to supervise any more visits, so the mother had no visits in September. Once visitation resumed, her visitation was consistent and appropriate. She rarely missed visits.

B.    *Additional Procedural Background.*

The juvenile court found no substantial probability that the child would be returned to the mother within six months. It explained: "The concern the Court has is the positive test on January 9 and the fact that [the mother] has not completed the outpatient substance abuse program." "[G]iven the nature of addiction and how recent the mother's abstinence has begun, with no evidence how long it has been, relapse remains a concern in this case. There was a relapse in this case with the mother testing positive . . . .

8

[T]here's no evidence before the Court that the mother can remain sober until [the six-month point]." "So while the Court can find that the mother has consistently and regularly contacted and visited the child, the Court cannot find that the mother has made significant progress in resolving the problems that led to the child's removal because the substance abuse outpatient treatment program has not been completed."

C.      *The Finding of No Significant Progress*.

According to the mother, the crucial question is whether she made significant progress in resolving the problems that led to the child's removal. As authority for that proposition, she cites section 366.21, subdivision (g)(1). Although she is correct, that one subdivision is not the whole story.

At a 12-month review hearing, "the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).)

If services have been provided for the requisite time, and if the court does not return the child to the parent, the juvenile court has a number of options. (§ 366.21, subd. (g).)

One is to "[o]rder that a hearing be held . . . pursuant to Section 366.26." (§ 366.21, subd. (g)(4).) "In any case in which the court orders that a hearing pursuant to

Section 366.26 shall be held, it shall also order the termination of reunification services." (§ 366.21, subd. (h).)

Another is to "[c]ontinue the case for up to six months." (§ 366.21, subd. (g)(1).) "The court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian. For purposes of this section, in order to find a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time, the court shall be required to find all of the following:

"(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child.

"(B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home.

"(C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1).)

Yet another is to "[o]rder that the child remain in foster care . . . if the court finds by clear and convincing evidence . . . that there is a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interests of the child

10

because the child is not a proper subject for adoption and has no one willing to accept legal guardianship as of the hearing date." (§ 366.21, subd. (g)(5).)

Here, the juvenile court chose the third option — to keep the child in foster care. It did not choose the first option — to set a section 366.26 hearing — because it found that Z. was not a proper subject for adoption and had no one willing to accept legal guardianship.

It did not choose the second option — to continue the case for six months — because it found that the mother had not made significant progress in resolving the problems that led to the child's removal.

Section 366.21 is clear that, if the juvenile court sets a section 366.26 hearing, it must terminate reunification services. It does *not* say that, *if it keeps the child in foster care*, it must terminate reunification services.

However, this result follows from section 361.5. Section 361.5, subdivision (a)(1)(A) says that, subject to exceptions, reunification services are provided for "12 months after the date the child entered foster care." Section 361.5, subdivision (a)(3)(A) is one of the exceptions. It says that reunification services "may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent" if — and only if — "there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period or . . . reasonable services have not been provided to the parent."

Here, for purposes of section 366.21, subdivision (g)(1), the juvenile court found no substantial probability that the child would be returned to the mother within six months. This finding also applies to section 361.5, subdivision (a)(3)(A). It follows that it could not extend reunification services for a further six months. Rather, it had to terminate them.

The mother does not contend that the juvenile court erred by refusing to return the child to her at the 12-month review hearing. (See § 366.21, subd. (f)(1).) Accordingly, what we are called upon to review is the finding that the mother had not made significant progress in resolving the problems that led to the child's removal. (§ 366.21, subd. (g)(1)(B).)

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

The problems that led to the removal included the mother's use of both methamphetamine and marijuana. The petition alleged, and the juvenile court found, that "[t]he mother . . . has an unresolved substance abuse problem, which negatively impacts her ability to provide and care for the child . . . ." Admittedly, there were also concerns

about C.S., Mo.S., and in at least one instance, the mother physically abusing Z., as well as concerns about domestic violence. Both concerns were largely resolved once C.S. was arrested and the mother left him. The mother had completed parenting and anger management classes and did not seem likely to use corporal punishment again. The concerns about her substance abuse, however, persisted. And the substance abuse allegation, even standing alone, was sufficient to support jurisdiction.

The mother had made little progress in overcoming her substance abuse. She had started outpatient treatment in February 2022, but she was terminated on an unknown date for nonattendance. She claimed this was because the facility's schedule conflicted with her work schedule. However, she did not raise that issue with the social worker until after she had already been terminated. In August 2022, she was given a new referral. However, she did not start immediately, because she wanted inpatient services. As a result, she was not scheduled for intake until December 2022. We do not count against her the delay caused by a fire, but she was rescheduled for intake in January 2023. Thus, at the time of the hearing, she had been in outpatient treatment again for all of six weeks.

Moreover, her drug-testing performance demonstrated negligible efforts to stop using. Out of ten drug tests between February and July, only one had been negative. Between April and September 2022, she stopped drug-testing at all. This caused her to be dropped from the system; thus, she has only herself to blame for her inability to test between September and October, when the social worker managed to get her reinstated.

13

Out of eight drug tests between October and January, again, only one had been negative. Her most recent positive test had been on January 9, less than two months before the hearing.

The mother argues that she had completed all the other elements of her reunification services plan. However, the juvenile court does not evaluate progress quantitatively, by checking elements of the plan off on a list. It evaluates it qualitatively, by considering how likely it is that the child can be returned to the parent. Here, in light of the mother's continued substance abuse, that likelihood was low.

CFS aptly cites *Dawnel D. v. Superior Court* (1999) 74 Cal.App.4th 393 (*Dawnel D.*), disapproved on other grounds in *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 848. In it, the court said: "Dawnel argues that . . . she regularly complied with the reunification plan. [Citation.] In support of her position, she points to her consistent participation in battered women groups, her completion of a parenting class, and her re-enrollment in substance abuse rehabilitation. . . . [H]owever, the real problem in this case was substance abuse. While Dawnel did participate in some services, she failed in her participation in the rehabilitation component of her plan. She tested positive for THC and amphetamines throughout the nearly nine months between the detention hearing and the six-month review hearing. Moreover, she did not test according to the schedule. Such a dismal performance in the most crucial aspect of the reunification plan can hardly be viewed as regular participation in services. Substantial evidence supports

14

the court's finding regarding Dawnel's noncompliance with the plan." (*Dawnel D.*, *supra*, at pp. 397-398.) *Dawnel D.* is all but on point.

We conclude that there was substantial evidence that the mother had not made significant progress in resolving the problems that led to the child's removal.

D.     *The Reasonableness of the Reunification Services*.

The mother also contends that the trial court erred by finding that she had been provided with reasonable services.

She forfeited this contention by failing to raise it below. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1365, fn. 6; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885–886; *In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) "[A] parent [may not] wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing. [Citation.]" (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.)

Even if not forfeited, the contention lacks merit.

"To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

"'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*In re A.G.*, *supra*, 12 Cal.App.5th at p. 1001.)

"We review a reasonable services finding to determine if it is supported by substantial evidence. [Citation.] We consider the evidence in the light most favorable to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.]" (*In re A.G.*, *supra*, 12 Cal.App.5th at p. 1001.)

The mother says, "the only service left for [her] to participate in was a substance abuse treatment program" — thus implicitly conceding that CFS provided her with every other service in a reasonable manner.

Her main complaint seems to be that when she requested inpatient services, she did not get them. Earlier, however, she had dropped out of outpatient services, claiming that they conflicted with her work schedule. It would be reasonable to suppose that inpatient services would conflict with her work schedule even more drastically, and might prevent her from working at all. Other than the mother's request, there is no reason to suppose that outpatient services were not adequate, or that she would have done any better in inpatient services.

The mother discussed the issue with a substance abuse counselor. The two of them agreed that she would try outpatient services first, and then she could have inpatient services "if she felt the need." As she never raised the issue again, it was reasonable for CFS to continue to provide only outpatient services.

16

The mother complains that, after she dropped out of an outpatient treatment program, she was referred back to the same program. However, she did not object; she never claimed again that it conflicted with her work schedule, and it appears that she was able to attend. The juvenile court was entitled to conclude that there was no further scheduling conflict (or that the conflict was spurious in the first place).

The mother also complains about three separate delays in her outpatient treatment. First, in September 2022, she was unable to drug-test, because she had been dropped from the system. Second, her intake appointment had to be rescheduled from January 2023 to February 2023 due to a fire at the facility. Third, she tried to test on January 31 and February 14, 2023, but her name was not in the system.

The first delay was entirely the mother's fault; she had not shown up since April 2022, and the system stopped generating test dates for her. The delay of one month due to a fire was not the mother's fault, but neither was it CFS's. It was hardly an unreasonable failure to provide services. Finally, her inability to test on January 31 and February 14, 2023 was immaterial. The juvenile court did not hold these instances against her; it simply noted that she had tested positive as recently as January 9. More important, on this record, it is absurd to suppose that, if only she had been able to test on these dates, she would have stopped using drugs.

We therefore conclude that the finding that the mother had been provided with reasonable services was supported by substantial evidence.

# IV

## THE DUTY TO INQUIRE OF EXTENDED FAMILY MEMBERS

The mother contends that the juvenile court and CFS failed to carry out their duty, under state statutes implementing ICWA, to inquire of extended family members.

A. *Additional Factual and Procedural Background.*

CFS obtained a warrant for Z.'s detention.

The mother consistently denied any Indian ancestry. On a "Family Find and ICWA Inquiry" form, she listed her adult children Mo.S and Mi.S as additional family contacts. When asked about relatives who could accept placement, she named two sets of maternal aunts and uncles: aunt V.O. and her husband, and aunt R.H. and her husband. A social worker contacted V.O., who declined a background check. Thus, the child was placed with R.H. for about three months.

In the report for the detention hearing, under "Follow up Action," the social worker listed, "Continue to ask relatives about Native American ancestry."

In the report for the jurisdictional/dispositional hearing, the social worker noted that the only inquiries had been to the mother but that no follow-up actions were planned. CFS recommended that the juvenile court find that ICWA did not apply. At the jurisdictional/dispositional hearing, the juvenile court did so find.

The reports for the six-month and 12-month review hearings similarly indicated that the only inquiries had been to the mother.

18

B.     *Discussion.*

Section 224.2 is a state statute enacted to implement and supplement ICWA.  As relevant here, it provides:

"(a)  The court [and] county welfare department . . . have an affirmative and continuing duty to inquire whether a child for whom a [dependency] petition . . . may be or has been filed, is or may be an Indian child. . . .

"(b)  If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 . . . , the county welfare department . . . has a duty to inquire whether that child is an Indian child.  Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."

Section 306 allows a social worker to take temporary custody of a child who is delivered by a peace officer, or to take temporary custody of a child without a warrant under specified circumstances.  (§ 306, subd. (a).)

CFS argues that, because a warrant issued for Z.'s detention, he was not "placed into the temporary custody of a county welfare department pursuant to Section 306," and therefore it had no duty to inquire of extended family members.

There is an intradivision split of authority on this question.  (Compare *In re Delila D.* (2023) 93 Cal.App.5th 953, 977 [duty to inquire of extended family members applies even when child is taken into custody pursuant to a warrant], pet. for rev. filed

19

Aug. 22, 2023, with *In re Andres R.* (2023) ___ Cal.App.5th ___, ___ [2023 Cal. App. LEXIS 638] [duty to inquire of extended family members does not apply when child is taken into custody pursuant to a warrant]; *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-680 [same], review granted, July 26, 2023, S280572; *In re Robert F.* (2023) 90 Cal.App.5th 492, 497, 500-504 [same], review granted, July 26, 2023, S279743.)

As noted, the issue is currently before the Supreme Court. Accordingly, there is no point in repeating or elaborating on the reasoning in these cases. Suffice it to say that this panel believes that *In re Delila D.* is the better reasoned decision, and thus that there is a duty to inquire of extended family members even when a child is taken into custody pursuant to a warrant.

CFS was aware of adult half-siblings Mo.S. and Mi.S., as well two sets of maternal aunts and uncles, and it was in communication with them all. Nevertheless, it made no ICWA inquiry of them. Given our holding that there was a duty to inquire of extended family members, this was error.

We note that our decision, such as it is, will have little practical effect. This is an appeal from a 12-month review hearing, not from the termination of parental rights. Accordingly, the remedy for a failure to carry out the duty to inquire of extended family members is not reversal (except of the finding that ICWA did not apply). Rather it is to "direct the juvenile court on remand to order CFS to comply with its inquiry and (if applicable) notice obligations under ICWA and related California law." (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 567–568.)

Even if we were to hold that there was no duty to inquire, the fact that the issue is unsettled means that the only practical thing for CFS to do on remand is to inquire of extended family members.  Otherwise, there is a risk that all future orders may be reversed, depending on which way the Supreme Court jumps.

V

DISPOSITION

The finding that ICWA did not apply is reversed.  In all other respects, the order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


I concur:

RAPHAEL
J.

21

[*In re Z.F.-G.*, E080883]

FIELDS, J., Concurring.

I fully concur in the majority's decision in this case except its determination adopting the reasoning and holding of this court's decision in *In re Delilah D.* (2023) 93 Cal.App.5th 953, regarding the scope of the ICWA inquiry required in this case. I continue to agree with and follow this court's decisions on the ICWA inquiry question in *In re Robert F.* (2023) 90 Cal.App.5th 492, 504 (*Robert F.*), review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-681, review granted July 26, 2023, S280572; and *In re Andres R.* (2023)___Cal.App.5th___(Aug. 23, 2023, E079972) [2023 Cal. App. LEXIS 638].

FIELDS            

J.